# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re:<br><br>**JEREMY WAYNE ROBERTUS and STEPHANIE RAE ROBERTUS,**<br><br>Debtors.<br><br>**BANK OF BAKER**,<br><br>Plaintiff,<br><br>-vs-<br><br>**JEREMY WAYNE ROBERTUS and STEPHANIE RAE ROBERTUS**,<br><br>Defendants. | Case No. **17-60071-7**<br><br><br><br><br><br>Adv. No. **17-00026-BPH** |

## MEMORANDUM of DECISION

At Butte in said District this 19th day of June, 2018.

In this Chapter 7[1] case, Bank of Baker ("Bank") is seeking to except from discharge $24,000, under 11 U.S.C. §§ 523(a)(6), against Jeremy Robertus and Stephanie Robertus. The matter has been tried and is ready for decision. As discussed below, the Court finds that the debt is dischargeable.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

1

**FACTS**

Debtor Jeremy Wayne Robertus ("Jeremy") was raised in a farming family and wanted to be a farmer. Debtor Stephanie Rae Robertus ("Stephanie") was raised in a ranching family. Jeremy and Stephanie (collectively "Debtors'), wanted to maintain the lifestyle that they experienced as children and expose their children to agriculture. Debtors began farming to accomplish this goal. Debtors' farming operation consisted of growing barley, millet and corn on leased land. Debtors owned miscellaneous machinery and equipment. Debtors owned no real property, and lived in a mobile home on real estate owned by one of their parents.

Debtors financed their farming operations. Debtors obtained loans from the Bank in 2007 and 2008, and again in 2016. Beginning in the fall of 2014, Debtors experienced increasing financial trouble. To sustain their dreams of farming, Debtors needed a successful harvest in 2016. According to Stephanie, if Debtors wanted to maintain the farm, they needed to make 2016 work. Debtors needed money to fund their 2016 agricultural operations. Debtors calculated the amounts they would need to get through the 2016 season and with this calculation in hand, Jeremy approached the Bank, through its President, Dean Wang ("Wang"), about a $150,000 operating loan.

At one point during the loan process, Wang contacted Jeremy and advised that Debtors did not have enough collateral for a $150,000 loan. Debtors conferred and agreed to put their home up as additional collateral.[2] Debtors were later informed by the Bank that their loan had been approved, and Debtors assumed that it had been approved for $150,000. In May of 2016,

---

[2] Debtors' home is listed in their schedules as a 1997 Bonneville 28 x 80 mobile home valued at $35,000.

2

Debtors went to the Bank and met with Norton Walker ("Walker")[3] to sign the loan documents.[4] Debtors testified that during this meeting they learned for the first time that the approved loan was only $75,000, not $150,000. Debtors were concerned that $75,000 was not enough money to get them through the 2016 season, and testified that they discussed their concerns with Walker. Following their conversation with Walker, Stephanie and Jeremy understood and concluded that they could use the sales proceeds from their 2016 crops to supplement the loan shortfall and get through to the end of the season. Walker testified that he did not tell Debtors that they could sell their crops and use the proceeds, and that he lacked the authority to advise a borrower to liquidate collateral and keep the proceeds.[5]

By August of 2016 Debtors had almost completely spent the $75,000 borrowed from the Bank. In late August, Jeremy harvested his barley and sold it to Muggli Brothers. Jeremy informed Muggli Brothers that the Bank had a lien on the barley and that the Bank's name needed to be on the weight tickets. The Bank's name was included on several of the weight tickets, but not all of the weight tickets. Muggli Brothers paid Jeremy for the barley, but the Bank's name did not appear on all the checks. Jeremy cashed the checks that were not made payable to the Bank and used approximately $24,000 to further fund his farming operations. He neither advised, nor consulted with the Bank prior to doing so.

---

[3] Norton Walker was formerly a vice president and loan officer at the Bank, but is now employed at Dakota West Credit Union.

[4] The loan documents included security agreements, UCC Financing Statements, and Effective Financing Statements, sufficient for perfecting a security interest in Debtors' crops. Debtors do not dispute that the Bank had a lien on their crops, including the barley and that this lien extended to the proceeds from the sale of any crops.

[5] The Court has weighed this conflicting testimony and considered the credibility of the witnesses to reconcile the conflicting accounts. Each of the witness' testified credibly. Rather than guess as to which witness' testimony was more truthful, the Court has decided to give all the testimony regarding the meeting little weight.

When Jeremy cashed the checks, Debtors believed that they could still service the Bank's debt. The loan payment was not due until March 1, 2017, and Debtors had millet and corn to harvest that would produce additional proceeds with which to satisfy the loan. Unfortunately, mother nature did not assist Debtors' remaining 2016 farming efforts. Although dry throughout much of 2016, rain in September frustrated the millet harvest. The rain in September was followed by a snow storm in mid-October and another snow storm in November that prevented Debtors from harvesting their 2016 corn crop resulting in losses.

Debtors' testified that throughout the summer and fall of 2016, repayment of the Bank's loan motivated Debtors to get going every day and that Debtors were working seven days a week. Along with their own farming, Jeremy supplemented their income by providing day labor for neighbors, hauling hay and outside mechanic jobs. Stephanie operated various machinery, and substantially contributed to their collective effort to make their farm operation a success.[6]

As a result of the crop losses, Jeremy filed an insurance claim, but was informed by his insurance company that he did not have crop insurance. Jeremy was surprised to learn he did not have crop insurance, because he had completed the paperwork necessary for obtaining it. He was further advised he did not have insurance because a form was not transmitted to the insurance company.[7] Debtors appealed the insurance company's ruling, and that appeal was still pending when Debtors filed their voluntary Chapter 13 bankruptcy petition on February 2, 2017.[8]

---

[6] This testimony was sincere and the Court concluded that Debtors' efforts were genuine and contrary to any suggestion that the Debtors had any subjective motive to injure the Bank.

[7] It was not clear to the Court who failed to transmit the form, the insurance agent, Jeremy or someone else.

[8] Debtors eventually lost their appeal.

Debtors' case was converted to Chapter 7 of the Bankruptcy Code on April 24, 2017. The Bank filed its complaint on July 31, 2017, seeking to except $24,000 attributable to the August barley proceeds spent by Jeremy on other expenses from Debtors' discharge under 11 U.S.C. § 523(a)(6). The Bank alleges that "Defendants converted the Plaintiff's collateral in the amount of approximately $24,000 through the sale of Plaintiff's collateral and retention of the sales proceeds." ₱22, Amended Complaint, ECF No. 11. Trial in this matter was held May 30, 2018. Wang, Walker, Stephanie and Jeremy testified. Exhibits 1, 2, 6, 7, 8 and 9 were admitted into evidence without objection.

**DISCUSSION**

The purpose of the Bankruptcy Code is to grant a "fresh start" to the "honest but unfortunate debtor." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 127 S. Ct. 1105, 1107, 166 L. Ed. 2d 956 (2007). A bankruptcy debtor is assumed to be "poor, but honest" and debts are presumed to be dischargeable unless a party proves otherwise with competent evidence. *Albarran v. New Forms, Inc. (In Re Albarran)*, 347 B. R. 369, 379 (9th Cir. BAP 2006). The Bank bears the burden of proving their claim against the Debtors is exempt from discharge under 11 U.S.C. § 523 (a)(6), by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

I. § 523(a)(6)

Section 523(a)(6) excepts from discharge debts resulting from "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. 523(a)(6). The willful and malicious requirements are conjunctive. However, the court considers the "willful" and "malicious" prongs of § 523(a)(6) separately. *Barboza v. New Form, Inc. (In re*

5

*Barboza)*, 545 F.3d 702, 706 (9th Cir. 2008) (citation omitted). "The willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury or that the debtor believed that injury was substantially certain to occur as a result of his conduct." *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1208 (9th Cir.2001), cert. denied, 533 U.S. 930, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001). The injury itself must be deliberate or intentional, "not merely a deliberate or intentional act that leads to injury." *Sparks v. King (In re King)*, 258 B.R. 786, 795 (Bankr. D.Mont. 2001). Thus, negligent or reckless acts which inflict consequential injury do not fall within the ambit of § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

An injury is malicious if it "involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 706 (9th Cir. 2008) (citation omitted).[9] As a threshold matter, the Court finds that the Bank has not satisfied any of the § 523(a)(6) elements as to Stephanie. Stephanie was not involved in the delivery of the barley to Muggli Brothers and Stephanie did not cash the checks for the barley. The evidence shows that she had nothing to do with the Muggli transaction that resulted in the barley proceeds Jeremy used to pay other expenses. Thus, the Court does not have any evidence before it that supports excepting $24,000 from Stephanie's discharge under § 523(a)(6).

Solely at issue is the Bank's claim against Jeremy. There is no dispute that: (i) the Bank had a perfected security interest in the barley; (ii) the Bank's lien extended to the proceeds that resulted from the sale of that barley; and, (iii) Jeremy cashed various checks from the sale of the

---

[9] Whether an injury is "malicious" requires a separate inquiry, which is reviewed for clear error. *Id.* at 1209 & n. 36; *Su v. Carrillo (In re Su)*, 259 B.R. 909, 914 (9th Cir. BAP 2001), aff'd, 290 F.3d 1140 (9th Cir.2002).

barley, and used the proceeds to fund Debtors' continuing operating expenses in 2016. However, the Court has concluded, after careful consideration of the testimony, that the Bank has failed to show that Jeremy had a subjective motive to inflict injury on the Bank, or that Jeremy believed that injury was substantially certain to occur as a result of cashing the checks from Muggli Brothers and using the barley sales proceeds to further fund the farming operation.

At the time Jeremy cashed the checks and used the barley proceeds, Debtors were still anticipating proceeds from the harvest of their millet and corn crops. Debtors expected that the funds from these crops would be available to pay the Bank. Debtors did not anticipate diminished yields from their millet crop. Debtors also did not anticipate the complete loss of their corn corp. Finally, Debtors did not anticipate that their crop insurance claim would be denied. On this record the Court cannot conclude that Jeremy acted with the requisite mental state required under § 523(a)(6). The Bank has failed to demonstrate by a preponderance of the evidence that Jeremy either had a subjective motive to inflict injury on the Bank, or believed that injury was substantially certain to occur.

If the evidence is viewed in the light most favorable to the Bank, one might conclude Jeremy acted negligently or recklessly, but that is insufficient to prevail on a claim under § 523(a)(6). The Supreme Court instructs that Jeremy's negligent or reckless acts simply do not fall within the ambit of § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57. Because the Bank failed to satisfy the willful injury prong of § 523(a)(6), consideration of whether Jeremy's acts were malicious is not necessary. The Bank's claims against Debtors under § 523(a)(6) are dismissed with prejudice.

II. § 523(d)

Having prevailed, Debtors seek attorney's fees and costs as permitted under § 523(d). Fees and costs to a prevailing debtor are provided for in § 523(a)(2) proceedings pursuant to § 523(d) which provides:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

"The purpose of § 523(d) is to deter creditors from bringing frivolous challenges to the discharge of consumer debts. See S.Rep. No. 98–65, at 9–10 (1983)." *First Card v. Hunt (In re Hunt)*, 238 F.3d 1098,1103–04 (9th Cir.2001); *Sparks v. King (In re King)*, 258 B.R. 786, 797–98 (Bankr.D.Mont.2001).

To recover attorney's fees under § 523(d), a debtor must prove: (1) the creditor requested a determination of the dischargeability of the debt under § 523(a)(2); (2) the debt is a consumer debt; and (3) the debt was discharged. *In re Stine*, 254 B.R. 244, 249 (9th Cir. BAP 2000), *aff'd*, 19 F. App'x 626 (9th Cir. 2001). Debtors have satisfied factors 1 and 3, but they have not met their burden with respect to factor 2. "Consumer debt" is defined in § 101(8) as "debt incurred by an individual primarily for a personal, family or household purpose." "It is settled in this circuit that the purpose for which the debt was incurred affects whether it falls within the statutory definition of 'consumer debt' and that debt incurred for business ventures or other profit-seeking activities does not qualify." *Meyer v. Hill (In re Hill)*, 268 B.R. 548, 552–53 (9th Cir. BAP 2001). In this case, Debtors secured the loan from the Bank to primarily fund their farming operation, with the hopes of making a profit on their crops. Additionally, Jeremy

8

testified that he used the $24,000 proceeds from the sale of barley to further fund his farming operations. "[B]ecause the debt was incurred with a profit motive, it is not consumer debt." *In re Bushkin*, 2016 WL 4040679 (9th Cir. BAP 2016). Debtors have failed to meet their burden of showing that the loan proceeds from the Bank were consumer debts. Therefore, Debtors' request for fees under § 523(d) is denied. In accordance with the foregoing,

IT IS ORDERED that the Court will enter a separate judgment in favor of the Debtor/Defendants, Jeremy Wayne Robertus and Stephanie Rae Robertus; Plaintiff Bank of Baker's complaint against Defendants is dismissed with prejudice; and Defendants' request for attorney's fees and costs under § 523(d) is denied.

BY THE COURT:

Hon. Benjamin P. Hursh
United States Bankruptcy Court
District of Montana